UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **LAURA HARRIS WINFORD** | : | **DOCKET NO. 2:12-CV-00322** |
| **VS.** | : | **JUDGE MINALDI** |
| **UNITED STATES OF AMERICA** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 21] filed by the plaintiff, Laura Harris Winford, to which the defendant, the United States of America, filed an opposition [Doc. 24] and an accompanying Cross Motion for Summary Judgment [Doc. 23]. Winford filed an opposition to the United States' cross summary judgment motion (and an incorporated reply to the United States' opposition to her summary judgment motion) [Doc. 26] and the United States filed a reply [Doc. 27]. As the undersigned finds that the motions are fully briefed, they are ripe for review. For the foregoing reasons, Winford's Motion for Summary Judgment is DENIED and the United States' Cross Motion for Summary Judgment is GRANTED.

## FACTUAL BACKGROUND

This case arises out of a dispute between the United States and Winford, as representative of the Laura Bishop McEldowney Estate ("Estate"), concerning Winford's efforts to collect a refund on overpayment of taxes on the Estate.[1] This court's jurisdiction is pursuant to 28 U.S.C.

---

[1] *See generally* Pl.'s Compl., [Doc. 1].

§ 1346, which concerns suits for the recovery of any internal revenue tax alleged to have been erroneously or illegally collected.[2]

The undisputed facts are as follows: Laura Bishop died in Lake Charles, Louisiana on October 29, 2002.[3] Bishop left a Last Will and Testament dated November 22, 1994 ("1994 Will"), which was admitted to probate in the 14th Judicial District Court ("14th JDC") in Calcasieu Parish, Louisiana, on October 30, 2002, commencing the Succession of Laura M. Bishop.[4] Pursuant the 1994 Will, Winford and two other individuals were named as Co-Executors of the Estate, with a trust ("the Bishop Trust") as the residuary legatee.[5] Less than a week after Bishop's death, Bishop's son, Richard T. Harriss, III, initiated litigation challenging the validity of the 1994 Will and asserting that the Co-Executors had acted improperly.[6] Later, one of Bishop's grandchildren, John Kaiser Harriss, also filed a lawsuit in Mississippi contesting the Co-Executors' actions.[7]

Under the Internal Revenue Code, the Estate was required to file a Form 706 estate tax return by July 29, 2003 (within nine months after Bishop's death).[8] An automatic six-month extension was available pursuant to 26 U.S.C. § 6801(a), which would have made the return due by January 29, 2004. Winford avers that she and the other Co-Executors were unable to determine Bishop's total assets and liabilities as a result of the pending litigation initiated by the Harrisses, which meant they were unable to gather the necessary information to prepare an

---

[2] *Id.* at ¶ 2.

[3] *Id.* at ¶ 4.

[4] *See* Ex. 1 to Def.'s Cross Mot. for Summ. J., [Doc. 28-2], at pp. 108-119.

[5] *Id.*

[6] Pl.'s Statement of Uncontested Material Facts to Mot. for Summ. J., [Doc. 21-3], at ¶¶ 4-5.

[7] *Id.* at ¶ 6.

[8] "Pl.'s Resp. to RFA," Ex. 2 to Def.'s Cross Mot. for Summ. J., [Doc. 28-3] at ¶ 2.

2

accurate Form 706 estate tax return by the filing deadline. In July 2003, in absence of filing a tax return, the Co-Executors filed Form 4768 "Application for Extension of Time to File a Return," although the IRS denied this extension request.[9] Along with Form 4768, the Co-Executors tendered a check for $230,884.00 ("2003 remittance") to the IRS.[10] The Co-Executors did not indicate on Form 4768 or the check whether the remittance was a "payment" or a "deposit."[11] Despite underlying ambiguities, the IRS posted the 2003 remittance as a "payment" on July 29, 2003.[12]

The litigation between the Co-Executors and the Harrisess concluded in late 2008 with the Co-Executors retaining control of the Estate, and the cost of litigation ultimately totaling $285,000.00.[13] Subsequently, the Co-Executors formally filed a federal estate tax return for the Estate on July 1, 2009. The return assessed the Estate's total tax liability as $94,598.00 after deducting the litigation cost from the value of the Estate.[14] The Co-Executors thus asserted that the Estate was due a credit of $136,268.00, which was the amount the 2003 remittance ($230,884.00) exceeded the Estate's liability ($94,598.00).[15] The IRS did not dispute the amount of the Estate's tax liability but disallowed the refund, noting that it was a "payment" subject to a

---

[9] Ex. 1 to Def.'s Cross Mot. for Summ. J., [Doc. 28-2], at p. 107. The Co-Executors also applied for an additional one-year extension, until July 29, 2005, but this was also denied because the Co-Executors had already received an automatic six-month extension pursuant to §6801(a).

[10] "2003 Remittance Check," Ex. D to Pl.'s Mot. for Summ. J., [Doc. 21-1] at p. 29.

[11] *See id.*

[12] "Certificate of Official Records at IRS," Ex. 4 to Def.'s Cross Mot. for Summ. J., [Doc. 28-6].

[13] Pl.'s Statement of Uncontested Material Facts to Mot. for Summ. J., [Doc. 21-3], at ¶ 13.

[14] "2009 Estate Tax Return," Ex. E to Pl.'s Mot. for Summ. J., [Doc. 21-1] at p. 30.

[15] *Id.*

three-year claim limitation under 26 U.S.C. § 6511, thus making the claim untimely.[16] The Co-Executors filed an internal administrative appeal with the IRS, which the IRS denied.[17]

Winford now moves for summary judgment, arguing that the 2003 remittance was a "deposit," and therefore not subject to the three-year statute of limitations which applies to payments. The United States has responded by filing a cross-motion for summary judgment, arguing that the 2003 remittance was "payment" and therefore subject to the three-year claim limitation.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment

---

[16] Ex. 1 to Def.'s Cross Mot. for Summ. J., [Doc. 28-2], at p. 1.

[17] *Id.*

is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party..." *Id.*

## LAW & ANALYSIS

The pivotal issue before the court is whether to characterize the Estate's 2003 remittance as a deposit or a payment. As stated *supra*, Winford argues the remittance is most certainly a deposit, whereas the USA takes the opposite tack and argues payment. While Benjamin Franklin may have opined that "nothing can be said to be certain, except death and taxes," these two diametrically opposed arguments indicate that there is nothing "certain" about this "death and taxes" situation.

At the onset, the United States argues that this Court lacks subject matter jurisdiction because the claim was untimely filed. Nonetheless, it also argues that the 2003 remittance was a payment based on the "facts and circumstances" test utilized by various courts. In her motion, Winford avers that the payment was considered a deposit as a matter of law based on Revenue Procedure 84-58. Alternatively, Winford asserts that the "facts and circumstances" test holds that the remittance was a deposit at the time of the 2003 remittance. The court will address each argument in turn.

### I. Jurisdiction

The United States first re-urges an argument it made in a prior motion to dismiss before this court: that this court lacks subject matter jurisdiction because the applicable three-year limitation period in 25 U.S.C. § 6511 precludes the refund claim in question. The United States once again requests that this court to adopt a *per se* rule that any remittance made along with a request for an extension to file a tax return should be deemed a payment rather than a deposit, thus definitively making the 2003 remittance a payment. In addressing the United States' prior

motion to dismiss, this court declined to apply the *per se* rule to the facts at bar, noting that the Fifth Circuit had declined to adopt the *per se* rule only a few years prior. *Winford v. United States*, 889 F. Supp. 2d 863, 867 (W.D. La. 2012). As the United States essentially rehashes old arguments from its prior motion to dismiss on this point, the undersigned declines to now reverse its original ruling on this issue.

## II.  Revenue Procedure 84-58

Winford urges the court find that Revenue Procedure 84-58 justifies the issuance of a credit in the Estate's favor. In relevant part, Revenue Procedure 84-58 which was applicable at the time the Co-Executors submitted the 2003 remittance[18] provided that:

> *Any undesignated remittance not described in section 4.03[19] made before the liability is proposed to the taxpayer in writing (e.g., before the issuance of a*

---

[18] The court notes that, Rev. Proc. 84-58 was revised in 2005 and is arguably now much clearer. *See* Rev. Proc.2005-16, 2005-10 I.R.B. 674, 2005 WL 376824 ("Except as provided in sections 4.04(1) and 4.05(3), *a remittance that is not designated as a deposit (an 'undesignated remittance') will be treated as a payment* and applied by the Service against any outstanding liability for taxes, penalties or interest.") (emphasis added). Rev. Proc.2005-16, however, was not effective until two years after the remittance was made, and thus provides no guidance in this case. *Id.*

[19] Section 4.03 provides:

*Payments of tax*

1 A remittance not specifically designated as a deposit in the nature of a cash bond will be treated as a payment of tax if it is made in response to a proposed liability, for example, as proposed in a revenue agent's or examiner's report, and remittance in full of the proposed liability is made. A partial remittance will not be treated as a partial payment of tax unless the taxpayer specifically designates what portion of the proposed liability the taxpayer intends to satisfy. If the remittance is treated as a partial payment of tax, it will be posted to the taxpayer's account as a payment as of the date it is received. That amount may be taken into account by the Service in determining the amount for which a notice of deficiency must be mailed. If the Service is unable to determine whether a partial remittance is intended to be a payment of tax or a deposit in the nature of a cash bond, the Service will treat the remittance as a deposit in the nature of a cash bond and will follow the procedures described in section 4.04.

2 If the remittance equals or exceeds the proposed liability, no notice of deficiency will be mailed. The taxpayer will not have the right to petition the Tax Court for a redetermination of the deficiency.

3 Remittances treated as payments of tax will be posted against the taxpayer's account upon receipt, or as soon as possible thereafter, and may be assessed provided that assessment will not imperil a criminal investigation or prosecution. In any case, the remittance will be applied against the taxpayer's account as of the date received by the Service.

> *revenue agent's or examiner's report), will be treated by the Service as a deposit in the nature of a cash bond.* Such a deposit is not subject to a claim for credit or refund and the excess of the deposit over the liability ultimately determined to be due will not bear interest under section 6611 of the Code. The taxpayer will be notified concerning the status of the remittance, and may elect to have the deposit returned, without interest, at any time before the issuance of a revenue agent's or examiner's report, subject to the provisions of subparagraph 1 of section 4.02.
> the taxpayer leaves an undesignated remittance on deposit until completion of the examination, the Service will follow the procedure described in section 4.02.

Rev. Proc. 84-58 § 4.04 (emphasis added) (footnote added). Winford argues that the 2003 remittance thus qualifies as a deposit because the Co-Executors did not designate the 2003 remittance as either a payment or a deposit at the time they sent it to the IRS.

In support of its position, Winford cites heavily to *Huskins v. United States*, 75 Fed. Cl. 659 (Fed. Cl. 2007), a case in which a Federal Claims court found that, because a remittance was undesignated, Revenue Procedure 84-58 required that the remittance be treated like a deposit. In *Huskins*, at the time the remittance was made, the personal representative of the estate could not timely file a Form 706 estate tax return, primarily because the estate's interest in a mortgage note and mortgage on one of its condominiums was uncertain as a result of a related foreclosure action. *Id.* The estate later agreed to sell the condominium, but the condominium's title insurance company would not permit its sale until the personal representative of an estate made a $165,000.00 remittance to the IRS in order to cover any federal tax liability. *Id.* at 663. The personal representative specifically instructed the estate's tax counsel that the $165,000.00 should be remitted to the IRS to stop the accrual of penalties and interest. *Id.* When the estate's tax counsel delivered the check to the IRS on May 5, 2000, he did not designate the $165,000.00

---

4 If the remittance exceeds the assessed liability including any interest and penalty, the balance will be returned to the taxpayer, without interest, provided the taxpayer has no other outstanding liabilities.

payment in a manner readily recognized by the IRS as being a payment or deposit, but the IRS nonetheless designated it as a "subsequent payment." *Id.* Two days after remitting the $165,000.00 to the IRS, the estate's tax counsel contacted the personal representative to let him know that he had "paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax." *Id.*

After years of litigation disputes involving the estate, the estate filed a late federal estate tax return on November 12, 2004, which stated that, after the values of the mortgage and the mortgage note were finally determined, no federal estate tax was due. *Id.* The IRS issued an Estate Tax Closing Document, confirming that no federal tax liability was owed. *Id.* On August 16, 2005, the estate's tax counsel sent a fax to the IRS confirming receipt of the Closing Document and requesting "status of the refund of the overpayment [of $165,000.00] shown on the return." *Id.* at 664. Similar to the case at bar, the United States argued that the remittance was a payment of tax rather than a deposit, and that the three-year statute of limitations for requesting refunds of overpayment of tax had expired, thus precluding the estate from recovery. *Id.* at 666. Under the facts presented, the *Huskins* court ruled that the remittance was a deposit, indicating that the taxpayer could obtain a refund of the deposit on a claim made after the expiration of the statue limitations. *Id.* at 668–69.

The *Huskins* interpreted Revenue Procedure 84-58, *supra*, to come to its conclusion that the $165,000.00 remittance was a payment:

> The court has determined that the May 5, 2000 remittance was a deposit. First, Rev. Proc. 84-58 uses the terms "designated" and "undesignated" to modify deposits, not payments. *See* Rev. Proc. 84-58. Indeed, under Rev. Proc. 84-58, a taxpayer either may "designate" remittances as deposits or leave them "undesignated." *Id.* Therefore, under Rev. Proc. 84-58, it would be impossible for the Estate to "designate" the remittance as a payment. Accordingly, the [estate's] cover letter referring to the May 5, 2000 remittance as a "payment" is not determinative. Second, section 4.03 provides that "[a] remittance not specifically

8

> designated as a deposit in the nature of a cash bond will be treated as a payment of tax if it is made in response to a proposed liability." Rev. Proc. 84-58 § 4.03. In this case, however, the Estate did not make the remittance in response to a proposed liability. Alternatively, section 4.04 provides that "any undesignated remittance not described in section 4.03 made before the liability is proposed to the taxpayer in writing (e.g., before the issuance of a revenue agent's or examiner's report), will be treated by the Service as a deposit in the nature of a cash bond." Rev. Proc. 84-58 § 4.04. Because these sections refer to one another, they were meant to be interpreted in combination. See 1A SUTHERLAND STATUTORY CONSTRUCTION § 32A:15 (6th ed.) ("The courts are unanimous concerning the primary legal effect of a statutory reference. Whenever an act of the legislature brings into itself by reference pre-existing common law precepts or the terms of another act, the precepts and terms to which reference is made are to be considered and treated as if they were incorporated into and made a part of the referring act just as completely as though they had been explicitly written therein."); see also 2A SUTHERLAND STATUTORY CONSTRUCTION § 46:5 (6th ed.) ("A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed."). Therefore, the court has determined that the term "any undesignated remittance" (Rev. Proc. 84-58 § 4.04) refers to "[a] remittance not specifically designated as a deposit in the nature of a cash bond" (Rev. Proc. 84-58 § 4.03). The court discerns no language in section 4.04 that limits its application to examinations *only*. Accordingly, the remittance at issue in this case was "undesignated" and Rev. Proc. 84-58, section 4.04 requires that it be treated as a tax deposit.

*Id.*

Applying the reasoning in the *Huskins* case to the facts at bar, Winford argues that this court should reach a similar result. In opposition, the United States casts doubt on this argument, noting that, on at least one occasion, a different judge in the Federal Claims Court, in *Boensel v. United States*, 99 Fed. Cl. 607 (Fed. Cl. 2011), held that Revenue Procedure 84-58 does not alter the "facts and circumstances" test, which should be the ultimate guidepost in discerning whether a remittance is a deposit or payment. *Id.* at 616. The *Boensel* court noted that the *Huskins* court, in interpreting Revenue Procedure 84-58, had inappropriately given short shrift to an important prior Federal Circuit case, *VanCanagan v. United States*, 231 F.3d 1349 (Fed. Cir. 2000). In

*VanCanagan*, the Federal Circuit addressed Revenue Procedure 84-58, noting that this was the specific procedure by which a tax payer could make a deposit. *VanCanagan*, 231 F.3d at 1353. The court held that when such a specific procedure exists, and the taxpayer does not use it, this failure weights against a finding that the remittance was a deposit. *Id.* This failure was thus treated by the *VanCanagan* court as one of many facts and circumstances to assess under the "facts and circumstances" test (discussed *infra*) in analyzing whether a remittance was a payment or a deposit. *See id.*

The United States' citations to *Boensel* and *VanCanagan* cast doubt on Winford's assertion that *Huskins* stands on firm ground and mandates that this particular remittance should be considered a deposit, full stop. By solely relying on the *Huskins* court's interpretation of Revenue Procedure 84-58, Winford essentially asks that the court adopt a *per se* rule of a different stripe than that requested by the United States: find that a remittance is a deposit because it was undesignated. The court similarly declines to do so, and thus must turn to the "facts and circumstances" test to analyze whether the 2003 remittance was a payment or a deposit.

### III. The "Facts and Circumstances" Test

In the alternative, the parties dispute whether the "facts and circumstances" test indicates that the 2003 remittance is a deposit or a payment. The Supreme Court's *Rosenman v. United States*, 323 U.S. 658, 65 S.Ct. 536 (1945), is the benchmark case in determining whether a remittance is a payment or a deposit. In applying *Rosenman,* courts have developed a series of facts and circumstances that are analyzed in order to classify a remittance, with no one factor being conclusive. *See VanCanagan v. United States,* 231 F.3d at 1353; *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1557 (Fed. Cir. 1997); *Cohen v. United States,* 995 F.2d 205, 208–

09 (Fed. Cir. 1993) (citing *Charles Leich & Co. v. United States*, 329 F.2d 649 (Ct. Cl. 1964)). In applying the "facts and circumstances test," courts generally hold the following factors as relevant: (1) whether the tax has been assessed by the IRS prior to the remittance; (2) whether the remittance is "disorderly," i.e. made without careful consideration of the potential tax liability; (3) whether the taxpayer contests liability; (4) whether the taxpayer indicates to the IRS that the remittance is a deposit; (5) whether the IRS viewed the remittance as a deposit; and, (6) whether the remittance was made when payment was due and submitted with a request for an extension of time within which to file a return. *See Boensel.*, 231 F.3d at 612–16.

### A. Whether the Remittance was Made Prior to Assessment

If a remittance is made prior to assessment of the estate tax, this factor will weigh in favor of a finding that the remittance was a deposit. *See id.* at 612. It is undisputed that the Co-Executors made the remittance prior to the IRS's assessment. Although the United States does not dispute that the estate tax liability had not been assessed at the time of the remittance, it nonetheless argues that this factor alone is not controlling on the question of whether the remittance was a deposit or a payment. Additionally, the United States notes that although the assessment has not been made, this does not mean that the taxpayer does not have a liability.

The existence of an assessment does not control the outcome in this case, but it is clear that the absence of an assessment in this case is a factor that weighs in favor of Winford's claim that the 2003 remittance was a deposit. *See id* (finding that the fact that an estate tax had not yet been assessed at the time of remittance was persuasive but not determinative of whether remittance was a deposit or not); *see also Charles Leich*, 329 F.2d at 653 (finding that because the government had made no assessment and taxpayer contested the proposed liability, a remittance was a deposit and not a payment); *Huskins*, 75 Fed.Cl. at 671 (finding that "the

absence of "an obligation imposed by law to pay any tax" weighs in favor of characterizing the remittance as a desposit...").

**B.      Whether the Remittance was "Disorderly"**

If a court finds that a remittance was disorderly, this factor will indicate that a remittance is a deposit. A disorderly remittance generally indicates that the taxpayer intended to make a deposit to avoid late penalties and interest. *Risman v. Commissioner*, 100 T.C. 191, 197 (1993). In determining whether a remittance was "disorderly," courts attempt to ascertain whether the amount of remittance was arbitrary or random. *Austin v. C.I.R.*, 72 T.C.M. (CCH) 782 (T.C. 1996). As one court has succinctly stated,

> Where a taxpayer admits that it has some liability, but simply dumps funds on the government in amounts which have no conceivable relationship to the temporarily undetermined liability, we have no trouble holding that the remittance is not a bona fide payment.... [In other cases] we held that amounts remitted as estimates of admitted tax liabilities were "overpayments," because they were "made incident to a bona fide and orderly discharge of the taxpayers' actual or reasonably apparent duties."

*Northern Natural Gas Co. v. United States*, 354 F.2d 310, 315 (Ct. Cl. 1965) (internal citations omitted).

Based on the uncontested facts, the Estate's total tax liability was $94,598.00, making it $136,286.00 more than the $230,88.00 the Estate tendered to the IRS in 2003. Once again relying on *Huskins*, Winford contends that the remittance was disorderly. In *Huskins*, the taxpayer made a remittance of $165,000.00 to the IRS in connection with potential estate tax liability and to avoid penalties after consulting a tax attorney and other experts in the field. *Huskins*, 75 Fed. Cl. at 672–73. To the taxpayer's surprise, after accounting for several deductions and credits, the estate had no liability. *Id.* at 673. While the IRS attempted to argue

that the $165,000.00 reflected a good faith estimate of taxes due because it was based on the estate tax counsel's calculations, the court rejected this argument:

> Based on all of these considerations, the court has determined that the $165,000 remittance was not based on a good faith estimate of any taxes due, but instead represented the value of the Condominium, minus expenses. *See N. Natural Gas Co.*, 354 F.2d at 315.(*i.e.*, the remittance "ha[d] no conceivable relationship to the temporarily undetermined liability."). The Government's proposition that the remittance was based on the average of the Estate's tax counsel's second two handwritten calculations is not credible, because this information was never reported to the Title Insurance Company. Nevertheless, even if the remittance was based on the "worst case scenario" calculation made *for the purpose of carrying out the Escrow Agreement*, the calculation excluded estate tax deductions and values based on probable litigation outcomes, and therefore was not made in "pursuance of the actual or reasonably apparent requirements of the code." H.R. REP. NO. 78-510, at 48 (1943) (Conf.Rep.). Accordingly, the court has determined that the Estate's May 5, 2000 remittance was disorderly.

*Id.* at 673 – 64 (emphasis in original) (internal footnote omitted).

In sum, Winford argues that the case at the bar is similar to *Huskins* because the overpayment of taxes was excessive and was motivated by penalty avoidance, thus making it "disorderly" and a deposit. The United States argues that the Estate's remittance was a "good faith estimate of taxes," that the Co-Executors were fully aware assets and liabilities, and that the only remote variable was the Estate's legal expenses. The United States further notes that the Co-Executors could have made a better estimate of the proper remittance amount if they had used all of the information in their possession, inferring that the Co-Executors purposely miscalculated the Estate's tax liability. Finally, the United States cites to the Co-Executor's explanation for their July 2003 request for extension in their Form 4768, in which the Co-Executors wrote that "[a]t this time, an accurate list of the decedent's assets has been compiled. However, a list of the succession's debts is still incomplete, due in part, to the ongoing litigation.

Attached is a partially completed Form 706 on which the estimated tax is based on the value of the successions assets less the liabilities known at this time."[20]

The undersigned rejects the United States' unsupported inference that the Co-Executors purposely overpaid the remittance on the hopes that it could later be considered a "disorderly" deposit. Nonetheless, reviewing the evidence, the court still finds that the 2003 remittance amount was not a mere "guesstimate" or "dumping of funds," but instead was based on a consideration of the Estate's known assets and liabilities, and thus constituted a good faith approximation of the Estate's tax liability. "Courts have held that lack of precision in the calculation of estimated taxes does not indicate that a remittance is not a payment of tax." *Boensel*, 99 Fed. Cl. At 613 (referencing *Blatt v. United States*, 34 F.3d 252, 256 (4th Cir.1994)). Accordingly, this favor weighs in favor of a finding that the 2003 remittance was a payment.

## C.  Whether the Taxpayer Contests Liability

If a taxpayer contests liability, then this factor will weigh in favor of a finding that the remittance is a deposit. The undisputed facts show that the Co-Executors did not dispute the tax liability. Winford nonetheless argues that there was no opportunity or need to protest the liability because no liability was imposed at the time of the remittance. Addressing a similar argument, the *Boensel* court, construing *Rosenman*, noted that even if liability has not been assessed yet, a taxpayer could still show he was contesting *future* liability by, for example, submitting the remittance check and indicating that it was "under protest and duress." *Boensel*, 99 Fed. Cl. at 613 (citing *Rosenman*, 323 U.S. at 660, 65 S.Ct. 536). Similarly, in this case, by failing to contest tax liability at the time they submitted the 2003 remittance and failing to contest the liability later on at any point, the Co-Executors' failures to contest weigh "heavily" in favor of characterizing the remittance as a payment. *Id.*

---

[20] Ex. 1 to Def.'s Cross Mot. for Summ. J., [Doc. 23-2], at p. 7.

### D. Whether the Taxpayer Indicated the Remittance was a Deposit

Unsurprisingly, if a taxpayer indicates that a remittance is a deposit, this factor will weigh in favor of a finding that the remittance is a deposit. Winford's brief is void of any reasoning to demonstrate that the Co-Executors intended the remittance to be a deposit. The sole argument offered by Winford is a single sentence from the *Huskins* court, which purportedly establishes that an undesignated remittance should be considered a deposit. Winford hazily quotes language from *Huskins* which they contend support their position: "the court finds it relevant that estate tax returns do not provide a blank for the return of deposits." *Huskins*, 75 Fed. Cl. at 677.

Winford's analogy to *Huskins* is unfounded in the instant case. *Huskins* is distinguishable from this case because, in *Huskins*, shortly after making the remittance, the estate's tax counsel sent a letter to the estate's personal representative, stating that he had "paid $165,000 out of the escrow to the United States Treasury as a *deposit* against the federal estate tax." *Id.* at 676. The *Huskins* court found this fact persuasive in ultimately deciding that the plaintiff had intended to designate the remittance as a deposit. *See id.* In the instant case, there are no documents showing that the Co-Executors believed the 2003 remittance to be a deposit. Further, the Fifth Circuit has held that absent any significant facts indicating otherwise, undesignated deposit are generally considered as payments. *See Deaton v. United States*, 440 F.3d 223 (5th Cir. 2006).

Winford submitted no contemporaneous evidence supporting her contention that the Co-Executors intended this amount to be a deposit when remitted. Additionally, there is nothing on the face of the document or on the check submitted with it indicating such intent. *Boensel*, 99 Fed. Cl. 607 (finding the remittance was a payment when the estate's intent was at issue and it failed to produce any evidence that it regarded the remittance as a deposit). Further, the United

States notes that the Winford's counsel was fully aware of the IRS's relevant deposit procedure but made no attempt to use the IRS procedure for making a deposit, instead arguing the remittance was a deposit *five years* after the remittance was made. *See VanCanagan*, 213 F.3d at 1354 (declining to the accept a taxpayer's re-characterization of a remittance as a deposit five and half years after the remittance was initially tendered). This factor indicates the 2003 remittance was a payment.

E.  **Whether the IRS viewed the remittance as a Deposit**

The United States notes and this court agrees that the undisputed facts show that he IRS did not view the remittance as a deposit – at the time the IRS received the remittance, it recorded the remittance as a "payment."[21] Winford does not contest that this factor indicates the remittance was a payment; rather, she counters that this factor is not dispositive and should be afforded less weight.

F.  **Whether the Remittance was made when Payment was Due**

When the remittance is accompanied by an extension request at the time the tax is due, the remittance is generally considered a payment. See *Essex v. Vinal*, 499 F.2d 226, 229 (8th Cir. 1974). In the instant case, the Co-Executors tendered the remittance in conjunction with an extension form. Therefore, this factor favors the United States.

After applying the "facts and circumstances" test, the facts and circumstances of this case demonstrate that the 2003 remittance was an "amount paid as estimated income tax" under § 6513(b)(2), not a deposit. Under that section, a remittance is deemed paid "on the last day prescribed for filing the return under § 6012 for such taxable year ...." I.R.C. § 6513(b)(2). Because the remittance was paid outside the look-back period of § 6511(b)(2)(A), the Estate

---

[21] "Certificate of Official Records at IRS," Ex. 4 to Def.'s Cross Mot. for Summ. J., [Doc. 28-6].

cannot recover their overpayment. I.R.C. § 6511(b)(2)(A). Accordingly, the United States is entitled to summary judgment and dismissal of the claims against it in the above-captioned case with prejudice.

Lake Charles, Louisiana, on this the ___ day of _____, 2013.

PATRICIA MINALDI
**UNITED STATES DISTRICT JUDGE**